# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Crossroads Residents Organized for Stable
and Secure ResiDencieS (CROSSRDS),
an unincorporated association;

Linda Lee Soderstrom, Maria Johnson,
Craig Goodwin, Donna Goodwin, Jurline Bryant,
Clara Jean Lee, Viky Martinez-Melgar,
Aurora Saenz, Deborah Suminguit,
on behalf of themselves and all others similarly situated;

Norma Ziegler, Darlene Fisher, Samuel Graham,
Carlos Hines, Kenneth Orr, Bernard Campbell,
Lisa Brown, David Moffet, Quaintance Clark,
Khadijah Abdul-Malik, Kevin Vaughn,
Maria de Lourdes Vargas-Pegueros,
Julio Stalin de Tourniel, Rocillo Rodriquez,
Sandra Ponce, Kerly Rios, Juan Martinez,
Mercedes Melgar, Tamara Ann Bane,
Charles Ward, Tressie Neloms, Dorothy Pickett,
Sylvia Anderson, Guadalupe Rodriguez Bonilla,
Tyrus Johnson, Leticia Barban, Alice Joiner,
Beverly Griffin; and

HOME Line,

       Plaintiffs,

      v.

MSP Crossroads Apartments LLC, and
Soderberg Apartment Specialists,

       Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 16-233 ADM/HB

_____

Timothy L. Thompson, Esq., Housing Justice Center, Saint Paul, MN, on behalf of Plaintiffs.

Bradley J. Lindeman, Esq., Meagher & Geer, P.L.L.P., Minneapolis, MN, on behalf of
Defendants.

_____

## I.  INTRODUCTION

On April 7, 2016, the undersigned United States District Judge heard oral argument on Defendants' Motion to Dismiss [Docket No. 10] and Plaintiffs' Motion for Preliminary Injunction [Docket No. 15].  The Motion to Dismiss will remain under advisement and will be the subject of a separate order.

At the hearing, both parties agreed it would be helpful to know whether injunctive relief would be granted as soon as possible given the effect of the Order on Plaintiffs' tenancy and an approaching May 31, 2016 deadline.  For the reasons set forth below, the Motion for Preliminary Injunction is denied.

## II.  BACKGROUND

In September 2015, Defendant MSP Crossroads Apartments LLC ("MSP Crossroads") purchased the housing complex then known as Crossroads at Penn Apartments in Richfield, Minnesota.  Compl. [Docket No. 1] ¶ 1.  With 698 units and relatively low rents, the complex was "one of the largest unsubsidized but affordable sources of rental housing in the Twin Cities region."  Id.  The tenant population included a significant number of ethnic minority or disabled tenants.  Id. ¶ 23.

Shortly after the purchase, MSP Crossroads and Defendant Soderberg Apartment Specialists ("SAS"), the managing agent, announced plans to rename the complex Concierge Apartments ("Concierge").  The new ownership planned "community-wide upgrades and renovation of all apartments and common areas."  Id. ¶¶ 25–26; Ex. A.  Defendants notified tenants that their leases would terminate at the end of their lease terms.  Id.  Tenants who wished to remain at Concierge would have to submit an application, be approved under Concierge's

screening criteria, and pay new market rate rents.  Id.

Plaintiffs, a group of tenants and organizations concerned about the effects of Defendants' plans, have brought a putative class action lawsuit alleging violations of the federal Fair Housing Act ("FHA") and Minn. Stat. § 504B.315.  See id. ¶¶ 67–76.  In brief, Plaintiffs' FHA claim is that Defendants' policies "constitute disparate treatment and cause disparate impact" on tenants based on race, national origin, disability, or familial status.  Id. ¶ 3.  Plaintiffs allege that "Defendants have and are continuing to force many current tenants and protected class members to move out through a combination of" increasing rents, requiring existing residents to reapply under restrictive screening criteria, imposing a tighter occupancy standard, refusing to continue under the Housing Choice Voucher Program ("Section 8"), and making continued participation in other voucher programs impossible.  Id. ¶ 2.

In their Motion for Preliminary Injunction, Plaintiffs seek an order requiring Defendants to accept, as the previous owner had, Section 8 vouchers while this lawsuit is pending.  Pls.' Mem. Supp. Mot. Prelim. Inj. [Docket No. 17] at 2–3.  The Section 8 voucher program provides rent subsidies to low-income families who rent from participating landlords.  Defs.' Mem. Opp'n Mot. Prelim. Inj. [Docket No. 33] at 3.  Section 8 is funded by the federal government and administered by local public housing authorities—in this case, the Richfield Housing and Redevelopment Authority ("RHRA").  Id. at 3–4.

The complex had approximately 35 tenants participating in the Section 8 program at the time of MSP Crossroads' acquisition.  Compl. ¶ 21.  On September 30, 2015, immediately after they acquired the complex, Defendants notified tenants that "Management does not participate in the Section 8 program" but "will honor all lease terms for current Section 8 residents until those

leases expire." Id. at Ex. A.  Defendants also allowed Section 8 tenants whose leases expired to remain at Concierge on a month-to-month basis and continue using their vouchers, first through February 29, 2016 and then extended by agreement until through May 31, 2016.  Id. at Exs. A–B.  Many of the Section 8 tenants have already moved out of Concierge.  Plaintiffs report that only 5–8 Section 8 tenants remained as of March 10, the date they filed their motion for injunctive relief.  Pls.' Mem. Supp. Mot. Prelim. Inj. at 5.

## III.  DISCUSSION

"A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant."  Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (citation omitted).  Four factors are balanced to determine whether injunctive relief is warranted:  (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between the harm to the movant and the harm that the relief would cause to the other litigants; and (4) the public interest.  Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  No single factor is determinative.  Id. at 113.  Instead, the court considers the particular circumstances of each case, with the focus on the primary question of whether the "balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  Id.

## A.  Likelihood of Success

"[A]n injunction cannot issue if there is no chance of success on the merits."  Mid-Am. Real Estate Co. v. Iowa Realty Co., 406 F.3d 969, 972 (8th Cir. 2005) (citations omitted).  As the moving party, Plaintiffs must show they have a "fair chance of prevailing" on their claims.

Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008).

The parties' arguments on the likelihood of success overlap their arguments on whether the motion to dismiss is appropriate, but with a particular focus on FHA case law involving Section 8.  Plaintiffs argue that a landlord's decision to withdraw from Section 8 can, even on its own, give rise to a disparate impact claim.  Further, Plaintiffs argue that discontinuation of Section 8 at Concierge will have a disparate impact on ethnic minority or disabled tenants due to the over-representation of such tenants in the RHRA Section 8 program.  Defendants, in response, stress that Section 8 is a voluntary program and argue that refusal to participate in Section 8 cannot create disparate impact liability under the FHA.  And even if a disparate impact claim were possible, Defendants argue, Plaintiffs have failed to establish a prima facie case.

The Supreme Court recently confirmed that disparate impact claims are generally cognizable under the FHA.  Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 135 S. Ct. 2507, 2525 (2015).  With respect to disparate impact claims based on refusal to participate in Section 8, however, the parties have not cited, and the Court has not been able to find, any applicable Supreme Court or Eighth Circuit authority.  The circuit courts that have considered the issue have differed in their conclusions.  The Second and Seventh Circuits seem to have endorsed a per se rule that refusal to participate in Section 8 cannot form the basis of a disparate impact claim under the FHA.  See Salute v. Stratford Greens Gardens Apts., 136 F.3d 293, 302 (2d Cir. 1998); Knapp v. Eagle Prop. Mgmt. Corp., 54 F.3d 1272, 1280 (7th Cir. 1995).  The Sixth Circuit has expressly rejected a per se rule and held that "a plaintiff can, in principle, rely on evidence of some instances of disparate impact to show that a landlord violated the Fair Housing Act by withdrawing from Section 8."  Graoch Assocs. #33, L.P. v. Louisville / Jefferson

Cty. Metro Human Relations Comm'n, 508 F.3d 366, 369 (6th Cir. 2007).  However, the Sixth

Circuit distinguished between landlords who withdraw from Section 8 and those who refuse to

participate in the first place, saying that the latter group "should never face disparate-impact

liability for non-participation in Section 8."  Id. at 377.[1]

At this early stage in the litigation, with many legal and factual questions yet to be

determined and little controlling authority to offer guidance, it is a difficult burden for Plaintiffs'

to establish a likelihood of success on the merits.  Both sides have made compelling arguments,

but neither side has identified a factually similar case that strongly favors its position.  The

closest Plaintiffs have come is Graoch, but even if the Court were to follow that case, two

significant questions would remain:  (1) whether Defendants' decision not to continue the

previous owners' policy of accepting Section 8 vouchers should be analyzed as withdrawal or as

non-participation, and (2) whether Plaintiffs have stated a prima facie case of disparate impact.

For present purposes, the Court does not need to answer those questions.  Instead, the Court

finds that the parties' arguments on the likelihood of success factor slightly favor Defendants,

who have no burden of proof.

**B.  Threat of Irreparable Harm**

Threat of irreparable harm requires an actual, presently existing threat of injury.  Rogers

---

[1] While the Motion for Preliminary Injunction was under advisement, Plaintiffs notified the Court of a recent decision addressing this issue.  In Burbank Apartments Tenant Association v. Kargman, No. 11872, 2016 Mass. LEXIS 245, at *36 (Mass. April 13, 2016), the Massachusetts Supreme Judicial Court declined to adopt a per se rule similar to that endorsed in Salute and Knapp and instead held that "a disparate impact claim is cognizable even if a defendant who is a private owner adheres to statutory, regulatory, and contractual obligations." This decision does not alter the analysis here.  It is not controlling authority, and it largely echoes the Sixth Circuit's analysis in Graoch.

v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982).  "Wholly speculative" harm will not justify

injunctive relief.  Local Union No. 884, United Rubber Workers, Cork, Linoleum & Plastic

Workers v. Bridgestone / Firestone, 61 F.3d 1347, 1355 (8th Cir. 1995).  "Irreparable harm

occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully

compensated through an award of damages."  Rogers Grp., Inc. v. City of Fayetteville, 629 F.3d

784, 789 (8th Cir. 2010) (quotation omitted).

Plaintiffs argue that the Section 8 tenants face irreparable harm because they are forced to

choose between two unsatisfactory options:  move out of Concierge and lose the home and

community they have created there, or stay and incur the financial repercussions of no longer

being able to use Section 8 vouchers.  Defendants respond that the tenants have known since

September 30, 2015 that they would not accept Section 8 vouchers.  Defendants argue that

Plaintiffs' delay in seeking a preliminary injunction is, in itself, evidence that the alleged harm is

neither great nor imminent.

Courts have found wrongful eviction from one's home to be irreparable harm.  Brown v.

Artery Org., Inc., 654 F. Supp. 1106, 1118 (D.D.C. 1987).  The rationale behind that rule is that

monetary damages cannot remedy the loss of particular real estate or the prospect of

homelessness or inadequate housing.  See id.; Johnson v. U.S. Dep't of Agric., 734 F.2d 774,

789 (11th Cir. 1984); McNeill v. New York City Hous. Auth., 719 F. Supp. 233, 254 (S.D.N.Y.

1989).  That rationale does not apply in full force to this case.  Here, Plaintiffs are renters.

Although they may have developed strong connections to their apartments and some have

resided there for many years, their tenancy has always been subject to the terms of their leases.

This fact distinguishes this case from those like Johnson, where the plaintiffs were homeowners

challenging a nonjudicial foreclosure method.  734 F.3d at 789.  And unlike the plaintiffs in

Brown and McNeill who faced almost certain eviction and a realistic prospect of homelessness,

Plaintiffs in this case have had notice for a considerable period of time that a major change was

occurring at their residence.  See Brown, 654 F. Supp. at 1118; McNeill, 719 F. Supp. at 254.

By the time Defendants stop accepting Section 8 vouchers on May 31, Plaintiffs will have had

eight months to work out a new lease and payment arrangement with Defendants or find a new

place to live.  See Compl. at Ex. B.  The Court recognizes that these are difficult options for

Plaintiffs, many of whom are low-income or disabled.  However, eight months is significantly

more notice than Plaintiffs were entitled to under their leases.  See id. at Ex. A.  The number of

Section 8 tenants who have already moved out of Concierge also suggests that alternative

housing is available.  See  Pls.' Mem. Supp. Mot. Prelim. Inj. at 5.  In these circumstances, the

extraordinary remedy of a preliminary injunction is not strictly necessary to avoid the harms

Plaintiffs face.  This Dataphase factor weighs slightly in Plaintiffs' favor.

## C.  Balance of Harms

The next Dataphase factor is the balance between the irreparable harm to the movant, and

the injury an injunction will cause to the other interested parties.  Dataphase, 640 F.2d at 113.

Plaintiffs argue that the balance of harms is in their favor, because moving would cause a

substantial hardship for each of the remaining Section 8 tenants, while continuing to accept

Section 8 vouchers from this small group of tenants would have a minor impact on Defendants'

operation of the 698-unit complex.  Defendants claim that any ordered Section 8 involvement

would carry significant administrative costs and hinder their efficient operation of the complex.

Further, Defendants argue that their postponement of the last date they would accept Section 8

vouchers from February 29 to May 31 is evidence not of limited harm but of the extent of their ability to afford the tenants additional time to find alternative housing.

Both of the identified harms are significant.  Moving is burdensome and stressful for anyone who has lived in their current home for a long time.  Navigating the requirements of the Section 8 program, even for a single unit within a large complex, requires an ongoing investment of resources that Defendants did not anticipate in their business plan.  The Court cannot say that either of these harms substantially outweighs the other.  This Dataphase factor favors neither party.

**D.  Public Interest**

The final Dataphase factor requires consideration of the public interest.  Dataphase, 640 F.2d at 114.  Plaintiffs cite the public's strong interest in the enforcement of the Fair Housing Act, which they argue would be served by an injunction allowing the Section 8 tenants to remain in their homes while they pursue the merits of their claims.  Defendants argue that denying the injunction would better serve the public interest by protecting property owners' rights and avoiding a disincentive to participating in the Section 8 program in the first place.

The public has an interest in all of the goals identified by the parties, and none of them substantially outweigh the others in this case.  This Dataphase factor is also a draw.

**E.  Administrability Concerns**

Although not a Dataphase factor, the Court's ability to administer the requested injunction is also a relevant consideration in determining whether to grant injunctive relief.  See Bano v. Union Carbide Corp., 361 F.3d 696, 716 (2d Cir. 2004); Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd., 970 F.2d 273, 277 (7th Cir. 1992); Natural Res.

9

Def. Council, Inc. v. U.S. E.P.A., 966 F.2d 1292, 1300 (9th Cir. 1992) ("Injunctive relief may be inappropriate where it requires constant supervision.").

In this case, it is not clear that an order directing Defendants to accept Section 8 vouchers from current tenants enrolled in the program will be effective to achieve their desired result:  the ability to stay in their current apartments while this lawsuit is pending.  First, Defendants have raised the issue of whether the absence of RHRA, the entity that administers the Section 8 program where Concierge is located, precludes an injunction altogether.  Plaintiffs argue that an injunction limited to the Defendants will be effective to continue the Section 8 program at Concierge because RHRA can discontinue voucher payments only in certain situations, none of which apply here.  Even if Plaintiffs are correct, the Court has concerns about an injunction that relies on an interested non-party's inability to say no.

Second, Plaintiffs admitted at the hearing that any injunction may not impose a rent freeze on the affected units.  Defendants have already raised rents at Concierge and, subject to the terms of the leases, may do so again.  If they do, the Court is concerned that difficult questions could arise regarding the RHRA's ability to pay (or refuse to pay) the increased rent, or that the rent increases would have the effect of undermining the injunction.

The Court is reluctant to issue an injunction that may require it to be "an ad hoc regulatory agency to supervise the activities of the parties"—or non-parties, in the case of the RHRA.  Original Cookie, 970 F.2d at 277.  The burdens of continued administration by the Court is a significant factor which also weighs against granting the injunction.

To summarize, two of the Dataphase factors are neutral and the remaining two, success on the merits and irreparable harm, favor opposite results and effectively cancel each other out.

The administrability concerns also weigh against the injunction.  This leaves the overall analysis tipped in favor of Defendants.  Consequently, Plaintiffs have not carried their burden of affirmatively showing that the injunction they seek is warranted.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Preliminary Injunction [Docket No. 15] is **DENIED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  April 15, 2016.