# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Crossroads Residents Organized for Stable
and Secure ResiDencieS (CROSSRDS),
an unincorporated association;

Linda Lee Soderstrom, Maria Johnson,
Craig Goodwin, Donna Goodwin, Jurline Bryant,
Clara Jean Lee, Viky Martinez-Melgar,
Aurora Saenz, Deborah Suminguit,
on behalf of themselves and all others similarly situated;

Norma Ziegler, Darlene Fisher, Samuel Graham,
Carlos Hines, Kenneth Orr, Bernard Campbell,
Lisa Brown, David Moffet, Quaintance Clark,
Khadijah Abdul-Malik, Kevin Vaughn,
Maria de Lourdes Vargas-Pegueros,
Julio Stalin de Tourniel, Rocillo Rodriquez,
Sandra Ponce, Kerly Rios, Juan Martinez,
Mercedes Melgar, Tamara Ann Bane,
Charles Ward, Tressie Neloms, Dorothy Pickett,
Sylvia Anderson, Guadalupe Rodriguez Bonilla,
Tyrus Johnson, Leticia Barban, Alice Joiner,
Beverly Griffin; and

HOME Line,

        Plaintiffs,

        v.

MSP Crossroads Apartments LLC, and
Soderberg Apartment Specialists,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 16-233 ADM/KMM

_____

Timothy L. Thompson, Esq., Housing Justice Center, Saint Paul, MN, on behalf of Plaintiffs.

Bradley J. Lindeman, Esq., Meagher & Geer, PLLP, Minneapolis, MN, on behalf of Defendants.

_____

## I.  INTRODUCTION

On April 7, 2016, the undersigned United States District Judge heard oral argument on Defendants' Motion to Dismiss [Docket No. 10] and Plaintiffs' Motion for Preliminary Injunction [Docket No. 15].  The Motion for Preliminary Injunction was denied by an April 15, 2016 Order [Docket No. 39].[1]  Presently before the Court is Defendants' Motion to Dismiss.

Plaintiffs have brought a putative class action lawsuit alleging violations of the federal Fair Housing Act, 42 U.S.C. § 3601 et seq., and Minn. Stat. § 504B.315.  Defendants argue in their Motion to Dismiss that Plaintiffs have not alleged sufficient facts to support their claims, both in general and with respect to many of the individual plaintiffs and HOME Line.  For the reasons set forth below, the Motion to Dismiss is granted in part and denied in part.

## II.  BACKGROUND[2]

This Fair Housing Act ("FHA") case concerns a large apartment complex located in Richfield, Minnesota.  Compl. [Docket No. 1] ¶ 1.  The complex was known as Crossroads at Penn Apartments until September 2015, when it was purchased by Defendant MSP Crossroads Apartments, LLC ("MSP Crossroads") and renamed Concierge Apartments (hereinafter, "Concierge" or "the complex").  Id.  MSP Crossroads retained Defendant Soderberg Apartment Specialists ("SAS") as the managing agent for the complex.  Id.

Plaintiffs are a group of tenants and tenant organizations concerned about the effect of

---

[1] The two motions are addressed in separate orders.  Whether injunctive relief would be granted affected the individual plaintiffs' tenancies and a May 31, 2016 deadline, necessitating an earlier ruling on that issue.

[2] In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).

Defendants' policies on tenants who belong to protected classes.  Plaintiff Crossroads Residents

Organized for Stable and Secure ResiDencieS ("CROSSRDS") is an unincorporated association

of current and former Concierge tenants.  Id. ¶ 5.  Plaintiff HOME Line is a nonprofit tenant

advocacy organization that both assists tenants and seeks to improve public and private policies

relating to rental housing.  Id. ¶ 8.  HOME Line has been actively working with Concierge

tenants since October 2015.  Id. ¶ 9.  The Complaint also names as plaintiffs 37 individuals who

are current or former Concierge tenants and belong to one or more protected classes.  See id. ¶ 6.

## A.  Crossroads at Penn Apartments

The complex at issue was previously called Crossroads at Penn Apartments.  Id. ¶ 1.  It

consists of 698 units, almost all of which are one-bedroom apartments.  Id. ¶ 19.  As of

September 2015, the complex housed a total of 2,230 residents, and rents ranged from $710 to

$760 per month.  Id. ¶¶ 19, 22.  The combination of its large size and moderate rents made the

complex "perhaps the largest source of unsubsidized affordable rental housing in the Twin Cities

Region."  Id. ¶ 19.

The tenant population at the complex was generally lower income, with a significant

number of ethnic minority or disabled tenants.  Id. ¶ 23.  Approximately 100 residents used rental

vouchers from the State of Minnesota's Group Residential Housing Program ("GRH"), which

assists low-income tenants who are senior or disabled.  Id. ¶ 20.  GRH vouchers cover rent and

utilities up to $891 per month.  Id.  Approximately 35 other tenants used vouchers through the

Housing Choice Voucher Program, commonly known as "Section 8."  Id. ¶ 21.

**B.  Crossroads at Penn Apartments Becomes Concierge Apartments**

MSP Crossroads purchased the complex in September 2015.  Id. ¶ 24.  In a letter to tenants dated September 30 (the "September 30 letter"), MSP Crossroads and managing agent SAS announced that they were renaming the complex Concierge Apartments "to reflect our exciting future plans."  Id. ¶ 25; Ex. A at 1.  The complex soon would undergo a renovation, the letter explained, and current tenants who wished to remain would have to submit an application, be approved under Concierge's screening criteria, and pay new market rate rents.  Id. ¶¶ 25  26.

**1.  Renovation and Re-branding**

The September 30 letter announced Defendants' plans for "community-wide upgrades and renovation of all apartments and common areas."  Id. Ex. A at 1.  Jim Soderberg, the president of SAS, described the plans as a "total transformation" of the complex and "a spectacular, condo-quality renovation."  Id. ¶ 29.  Defendants upgraded the kitchen of each unit with granite countertops, stainless steel appliances, and new cabinets and sinks.  Id. ¶ 30; Ex. A at 1.  New amenities in the common areas of the complex include a fitness center, yoga studio, indoor golf simulator, game room, spa, and pet spa.  Id. ¶¶ 30  31.

Plaintiffs allege that the renovations and name change are designed to appeal to young professionals.  Id. ¶ 2.  For example, a listing on ForRent.com highlighted the recent renovations as well as the complex's outdoor pool and tennis courts    all changes that a local news report described as being "up young professionals' alleys."  Id. ¶¶ 30  31.  Defendants have targeted Best Buy employees in their marketing, as Best Buy's corporate headquarters is across the street from the complex.  Id. ¶ 31.

Defendants describe the renovations as needed and overdue.  Soderberg explained to a reporter, "When you get to the point when things are so run down, you attract undesirable residents.  You get to the point where good, responsible people don't want to live in these apartments."  Id. ¶ 44.  He made essentially the same point at a Richfield City Council meeting. Id.  One of SAS's specialties, according to Soderberg's LinkedIn page, is "turning problem neighborhoods and cities around by doing extreme makeovers on problem apartment complexes and attracting great residents to live in our communities."  Id. ¶ 45.

### 2. Tenants' Options

Included in the September 30 letter was a notice to all residents that their leases would terminate at the end of their current lease terms.  Id. ¶ 25; Ex. A at 1.  Although the letter included "an invitation and request" that current tenants apply to remain residents at Concierge, it also acknowledged that "the renovation plan, our new rental rates and screening criteria may be challenging for some of our residents."  Id. Ex. A at 1.  The letter sets forth three options for current tenants:  terminate their leases early without penalty, wait until their current lease term ends and move out at that time, or apply for a new lease subject to Concierge's terms and conditions.  Id.

Tenants applying for new leases have to meet the same rental criteria as all new applicants.  Id. at 2.  These criteria include a credit score of 625 or higher, income at least 2.5 (later raised to 3) times the rent, and positive rental history.  Id. at 3.  Applicants also must provide their Social Security number and photo identification.  Id. at 3  4.  Additionally, the lease application states that Concierge allows no more than two occupants per bedroom, "NO EXCEPTIONS."  Id. at 3.  It also notes that Defendants "are an equal opportunity housing

provider." Id.

If approved for a new lease, the tenants must pay new market rate rents that range from $879 to $949 per month. Id. ¶ 28; Ex. A at 1  2. Section 8 vouchers will no longer be accepted, and tenants participating in the Section 8 program were given the option of extending their current lease until February 29, 2016. Id. Ex. A at 2. Concierge did not state a position on GRH vouchers, but the combination of rent increases and new rental criteria effectively precluded GRH residents from continuing to reside at the complex. Id. ¶ 43.

## C. Reactions to Changes at the Complex

Tenants and social service providers reacted to Defendants' September 30 letter with dismay because they feared the new policies would force many tenants out of the complex. Id. ¶ 38. The limitation of two persons per bedroom (hereafter "occupancy standard") would require at least 834 people to relocate, because as of September 2015, the complex had a total of 2,230 residents across 698 one-bedroom apartments (an average of 3.2 residents per apartment). Id. ¶ 32. The requirement that tenants provide a Social Security number disqualifies undocumented immigrants, who Plaintiffs allege account for a substantial number of the complex's large Latino population. Id. ¶ 36. The decision to no longer accept Section 8 vouchers excludes the approximately 35 tenants who relied on that program. Id. ¶ 21. And the higher rents and income and credit score requirements posed obstacles for many tenants, especially the 100 tenants who participated in the GRH voucher program. Id. ¶¶ 20, 37. Richfield Mayor Debbie Goettel estimated that a total of 267 families could be displaced from the complex. Id. ¶ 41. As of January 2016, at least 159 units had been vacated. Id.

After hearing from upset tenants and the Richfield Public School District, which was concerned about the large number of families facing displacement in the middle of the school year, Defendants sent a letter to tenants on October 19 announcing that they were delaying implementation of some of the new policies until May 31, 2016.  Id. ¶ 39; Ex. B.  The letter stated that tenants could remain in their apartments without being approved under Concierge's rental criteria and, if applicable, continue using Section 8 vouchers until May 31.  Id. ¶ 39; Ex. B. The rent increases, however, would still take effect upon the expiration of each tenant's current lease.  Id. ¶ 39; Ex. B.  The letter also recited that Defendants "will be reviewing our screening and application requirements in an effort to make it possible for more current residents to remain at the property."  Id. ¶ 39; Ex. B at 2.  According to Plaintiffs, Defendants have not made any changes to the screening or rental requirements since that time.  Id. ¶ 39.

**D.  The Present Dispute**

On November 19, 2015, Plaintiffs' counsel wrote to Defendants on behalf of several organizations, including HOME Line, that were working with tenants affected by the changes at the complex.  Id. ¶ 47; Ex. C.  The letter expressed concern about the changes and suggested that Defendants' policies could have a disparate impact on protected classes under state and federal fair housing laws.  Id.  The letter also contained a proposal, based on discussions the organizations had with the City of Richfield and Hennepin County, that Defendants reduce rents on a to-be-determined share of the units at Concierge in exchange for financial assistance and a tax break.  Id.

Counsel for Defendants responded by letter on November 30, 2015 defending Defendants' plans and declining the proposal to reduce rents on some share of units.  Id. ¶ 48;

7

Ex. D.  Defendants noted that they operate a private business and have a right and a need to increase rents to reflect the market rates for comparable properties in the area and the investment Defendants were making in the complex.  Id. Ex. D at 5.  They also asserted that the previous owner had not modernized the complex "for decades," which accounted for both the previously low rents and the need for renovations.  Id. at 4.

Plaintiffs commenced this action on February 1, 2016 alleging that Defendants' course of action at the complex violates the FHA, under both disparate treatment and disparate impact theories, and Minn. Stat. § 504B.315.  Compl. ¶¶ 67 76.  Defendants have moved to dismiss the Complaint in its entirety for failure to state a claim, or, in the alternative, to dismiss many of the individual plaintiffs and HOME Line as parties to the action.

## III.  DISCUSSION

### A.  Motion to Dismiss Standard

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.  Hamm, 15 F.3d at 112; Ossman v. Diana Corp., 825 F. Supp. 870, 879 80 (D. Minn. 1993).  Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party.  Ossman, 825 F. Supp. at 880.

Working in combination with Rule 8, Rule 12 requires the plaintiff's factual allegations to "raise a right to relief above the speculative level," and push claims "across the line from conceivable to plausible."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007).  In other

words, the complaint must establish more than a "sheer possibility that a defendant has acted

unlawfully." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." <u>Id.</u>  Determining whether a complaint states a

plausible claim for relief is "a context-specific task that requires the reviewing court to draw on

its judicial experience and common sense." <u>Id.</u> at 679.  "But where the well-pleaded facts do not

permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged   but it has not 'shown'   'that the pleader is entitled to relief.'" <u>Id.</u> (quoting Fed. R. Civ.

P. 8(a)(2)).

**B.  Fair Housing Act**

The FHA makes it unlawful to discriminate in the provision of housing on the basis of

race, color, religion, sex, familial status, national origin, or handicap.  42 U.S.C. § 3604.  Enacted

in 1968 and amended in 1988, the FHA is a broad remedial statute intended "to replace

segregated neighborhoods with 'truly integrated and balanced living patterns.'"  78 Fed. Reg.

11460, 11461 (Feb. 15, 2013) (quoting <u>Trafficante v. Metro. Life Ins. Co.</u>, 409 U.S. 205, 211

(1972).  As the Supreme Court recently noted, the FHA plays a "continuing role in moving the

Nation toward a more integrated society." <u>Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive</u>

<u>Cmtys. Project, Inc.</u>, 135 S. Ct. 2507, 2526 (2015).

Plaintiffs have raised three legal claims under the FHA.  Their first two claims are based

on the series of actions Defendants have taken allegedly to alter the tenant population at

Concierge   including raising rents, imposing new rental criteria, and discontinuing participation

in the Section 8 program.  They claim that these actions both constitute disparate treatment and

9

cause a disparate impact on the basis of race, disability, familial status and national origin. Plaintiffs' third claim alleges that one of Defendants' actions in particular    the adoption of a more restrictive occupancy standard at Concierge    is having a disparate impact on the basis of familial status.

### 1. Disparate Treatment

"Disparate-treatment claims under the FHA are tested under the same framework as Title VII disparate-treatment claims.  The standard is familiar    did the defendant(s) treat the plaintiff(s) less favorably than others based on their race, color, religion, sex or national origin?" Gallagher v. Magner, 619 F.3d 823, 831 (8th Cir. 2010) (citations omitted).  Despite the focus on differential treatment, facially neutral policies are not immune from disparate treatment claims. See United States v. Badgett, 976 F.2d 1176, 1179 (8th Cir. 1992) ("The mere fact that the [challenged policy] was 'applied to everybody . . .' is not sufficient to demonstrate compliance with the [FHA].").  The ultimate question is whether the defendant had discriminatory intent. Gallagher, 619 F.3d at 831.

If Plaintiffs are to ultimately prevail, they will need to "produce either (a) direct evidence of discriminatory intent or (b) indirect evidence creating an inference of discriminatory intent under the McDonnell Douglas burden-shifting framework." Id.  To survive Defendants' Motion to Dismiss, however, Plaintiffs need only plead factual allegations that demonstrate a plausible claim to relief.  Twombly, 550 U.S. at 555, 570; Ring v. First Interstate Mortg., 984 F.2d 924, 925 (8th Cir. 1993) (reversing dismissal of FHA claim because the district court applied an evidentiary rather than pleading standard).  "When a federal court reviews the sufficiency of a complaint . . . [t]he issue is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims."  Ring, 984 F.2d at

926  27 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

Plaintiffs summarize their disparate treatment claim as follows:  Defendants' plans for

Concierge "were designed to not only remake the building but to remake the tenant population as

well, in order in part to reduce the number of tenants of color and with disabilities, so the

building would be more appealing to a young urban professional population."  Pls.' Mem. Opp.

Mot. Dismiss [Docket No. 29] at 14.  They base this claim primarily on the allegations that

Defendants' policies will displace a significant portion of the current tenant population, which

includes a disproportionate number of ethnic minority and disabled tenants; that the renovation

and marketing for Concierge are geared toward young professionals who are likely to be white

and non-disabled; and that Soderberg cited "undesirable residents" as a reason to make changes

at the complex.[3]  Compl. ¶¶ 30  31, 44, 50.

Plaintiffs are entitled to relief under the FHA if they prove, as they allege, that

Defendants' actions were motivated even in part by a desire to reduce the number of protected

class tenants residing at the complex.  See 42 U.S.C. § 3604; Williams v. Matthews Co., 499

F.2d 819, 826 (8th Cir. 1974) ("Race is an impermissible factor in real estate transactions . . . and

---

[3] After filing the Complaint, Plaintiffs discovered an additional statement by Soderberg
that they argue supports their disparate treatment claim.  As a panelist discussing the role
management can play in ensuring a healthy apartment community, Soderberg allegedly stated:
"The hard part is attracting good, responsible residents.  It is easy to get rid of bad tenants.  Add
improvements to buildings to attract clientele.  Make apartments attractive to 'Bring in the
Caribou crowd, and move out the Jerry Springer crowd.'"  Hauge Decl. [Docket No. 20] Ex. 9 at
3.  Plaintiffs contend that "Caribou crowd" and "Jerry Springer crowd" is racially coded
language.  They request leave to amend the Complaint to include this statement if the Court finds
the existing allegations of intentional discrimination to be insufficient.  Because the Complaint as
written contains sufficient factual allegations to support a disparate treatment claim, Plaintiffs'
request for leave to amend is denied.

cannot be brushed aside because it was neither the sole reason for discrimination nor the total factor of discrimination."). And Plaintiffs have pleaded sufficient facts to push this allegation "across the line from conceivable to plausible." Twombly, 550 U.S. at 570. The alleged disparate impact of Defendants' actions is "an important starting point for determining discriminatory intent" and may be determinative in "rare cases where the pattern of discriminatory effect is stark." Gallagher, 619 F.3d at 833 (citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)). Additionally, Soderberg's statement about "undesirable residents" and Defendants' apparent target market for Concierge suggest that the disparate impact might not be coincidence. See Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1085 (8th Cir. 2010) (noting that racially charged code words may provide evidence of discriminatory intent); Smith v. Town of Clarkton, 682 F.2d 1055, 1066 (4th Cir. 1982) (interpreting the term "undesirables" as a racially charged code word). Thus, Plaintiffs have alleged a disparate treatment claim that is plausible on its face and are entitled an opportunity to offer evidence to support their claim.

### 2. Disparate Impact

The Supreme Court recently confirmed that disparate impact claims are cognizable under the FHA. Inclusive Cmtys., 135 S. Ct. at 2525. A disparate impact theory of liability challenges practices that are "fair in form, but discriminatory in operation." Saunders v. Farmers Ins. Exch., 537 F.3d 961, 964 (8th Cir. 2008) (quoting Griggs v. Dukes Power Co., 401 U.S. 424, 431 (1971)). As the Ninth Circuit has explained,

> Disparate impact provides a remedy in two situations that disparate treatment may not reach. First, "[i]t permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy

classification."  Second, disparate impact . . . also targets
"artificial, arbitrary, and unnecessary barriers" to minority housing
and integration that can occur through unthinking, even if not
malignant, policies of developers and governmental entities.

Ave. 6E Invs., LLC v. City of Yuma, 818 F.3d 493, 503 (9th Cir. 2016) (quoting Inclusive

Cmtys., 135 S. Ct. at 2522); see also Smith v. Anchor Bldg. Corp., 536 F.2d 231, 233 (8th Cir.

1976) ("Effect, not motivation, is the touchstone because a thoughtless housing practice can be as

unfair to minority rights as a willful scheme.").

A regulation from the Department of Housing and Urban Development ("HUD")

provides a burden-shifting framework for adjudicating disparate impact claims under the FHA.

See 78 Fed. Reg. at 11460.  First, the plaintiff must make a prima facie showing of disparate

impact, meaning that the plaintiff "has the burden of proving that a challenged practice caused or

predictably will cause a discriminatory effect."  24 C.F.R. § 100.500(c)(1).  Once the plaintiff

makes a prima facie showing, the burden shifts to the defendant to prove that the challenged

practice "is necessary to achieve one or more substantial, legitimate, nondiscriminatory

interests."  Id. § 100.500(c)(2).  If the defendant satisfies its burden, the plaintiff may still prevail

by proving that the defendant's proffered interests "could be served by another practice that has a

less discriminatory effect."  Id. § 100.500(c)(3).

In Inclusive Communities, the Supreme Court announced several "safeguards" to

incorporate into the burden-shifting framework to ensure that disparate impact liability does not

"displace valid governmental and private priorities."  135 S. Ct. at 2524.  Those safeguards

include a "robust causality requirement" at the prima facie stage, and, after the burden shifts to

the defendant, "leeway to state and explain the valid interest served by [the defendant's]

CASE 0:16-cv-00233-ADM-KMM   Document 41   Filed 07/05/16   Page 14 of 26

policies." Id. at 2522 23.

Here, Plaintiffs have pleaded two alternative showings of disparate impact. First, they allege that Defendants' policies at Concierge will reduce the already short supply of affordable housing that protected class members disproportionately rely upon. See Compl. ¶¶ 52 54. The Eighth Circuit endorsed this method of showing disparate impact in Gallagher:

> Where a plaintiff demonstrates that a protected group depends on low-income housing to a greater extent than the non-protected population, other courts have found it reasonable to infer that the protected group will experience a disproportionate adverse effect from a policy or decision that reduces low-income housing.

619 F.3d at 835. Defendants, however, argue that this method of showing disparate impact applies only when the defendant is a governmental entity. While it is true that Gallagher and the other cases employing this method have all involved governmental defendants, Defendants have not cited any authority recognizing that pattern as a rule.[4] In any event, it is not necessary to decide that issue here because Plaintiffs' alternative method of showing disparate impact clearly applies to cases involving non-governmental defendants.

For their alternative showing of disparate impact, Plaintiffs allege that tenants at the complex harmed by Defendants' actions are disproportionately protected class members. See

---

[4] Defendants cite as support the Sixth Circuit's observation in Graoch Associates #33, L.P. v. Louisville/Jefferson County Metro Human Relations Commission, 508 F.3d 366, 373 (6th Cir. 2007), that only governmental defendants could have "the authority to control the housing development and allocation decisions of third parties." But there the Sixth Circuit was discussing the factors to consider at the third stage of the burden-shifting framework, not the appropriate comparison groups to use to demonstrate disparate impact at the prima facie stage. Moreover, Graoch pre-dates the burden-shifting framework promulgated by HUD, which expressly declined to draw a distinction between public and private defendants "because there is nothing in the text of the Act or its legislative history to indicate that Congress intended to distinguish the manner in which the Act applies to public versus private entities." 78 Fed. Reg. at 11474.

Compl. ¶¶ 55 59.  This is a common approach to showing disparate impact in cases, like this one, that challenge a landlord's rental policies.  See Betsey v. Turtle Creek Assocs., 736 F.2d 983, 988 (4th Cir. 1984) (adults-only policy); Bronson v. Crestwood Lake Section 1 Holding Corp., 724 F. Supp. 148, 154 (S.D.N.Y. 1989) (policy requiring income greater than three times the rent and refusing Section 8 vouchers); Green v. Sunpointe Assocs., Ltd., No. C96-1542C, 1997 WL 1526484, at *5 (W.D. Wash. May 12, 1997) (withdrawal from Section 8 program).  In Betsey, the court measured disparate impact in two ways.  First the court looked at the percentage of protected class members among the subset of tenants who were harmed (i.e., received a termination notice) on account of the challenged policy, finding that 68.3 percent of the harmed tenants were racial minorities.  736 F.2d at 988.  Second the court compared the rates at which, in the total tenant population, the challenged policy harmed protected class members as opposed to non-protected class members, finding that the policy harmed 54.3 percent of racial minorities but only 14.1 percent of whites.  Id.; see also Green, 1997 WL 1526484, at *4 5 (discussing and applying the criteria used in Betsey).

Although the Complaint does not contain all the data necessary to calculate the criteria used in Betsey, it does contain enough factual allegations to support an inference that Plaintiffs will ultimately be able to show a disparate impact through statistical analysis.  The most specific allegations relate to Concierge tenants' participation in the Section 8 and GRH voucher programs.  Plaintiffs allege that approximately 35 tenants relied on Section 8 vouchers and 100 tenants relied on GRH vouchers; that many if not most of these tenants belong to one or more protected classes; and that Defendants' policies will force all of these tenants to relocate.  Compl. ¶¶ 20 21, 42 43, 58.  More generally, Plaintiffs allege that protected class members are

overrepresented at the complex as compared to the surrounding area; that a high percentage of

protected class members in the Twin Cities are low-income renters; and that Defendants' new

rents and rental criteria pose a high hurdle for low-income renters.  Id. ¶¶ 51, 54  57, 59.  Those

factual allegations support an inference that, once they have complete data on the tenant

population, Plaintiffs will be able to show that the impact of Defendants' actions falls

disproportionately on protected class members.  Plaintiffs therefore have satisfied their burden

"at this early stage of the proceedings . . . to assert a plausible claim of disparate impact."  Folger

v. City of Minneapolis, 43 F. Supp. 3d 922, 940 (D. Minn. 2014).[5]

None of Defendants' arguments to the contrary are persuasive.  First, Defendants assert

that "Plaintiffs must allege the composition of the applicant pool" in order to plead a disparate

impact claim.  Defs.' Mem. Supp. Mot. Dismiss [Docket No. 12] at 19.  Using the applicant pool

as a baseline may be one way to show that Defendants' actions are causing a disparate impact,

but it is not the only way.  No particular statistical comparison is required because "statistics to

prove discrimination 'come in infinite variety and . . . their usefulness depends on all of the

surrounding facts and circumstances.'"  Gallagher, 619 F.3d at 837 (quoting Int'l Bhd. of

Teamsters v. United States, 431 U.S. 324, 340 (1977)).  Under circumstances similar to the

present case, the Betsey court endorsed a disparate impact analysis that was limited to tenants

residing in the building at the time the challenged policy was imposed.  736 F.2d at 987.

Because plaintiffs "are required to prove only that a given policy had a discriminatory impact on

---

[5] Defendants argue that Folger misstates the pleading standard applicable to FHA disparate impact claims because it pre-dates Iqbal, Twombly, and Inclusive Communities. Actually, Folger was decided several years after Iqbal and Twombly.  And although Folger preceded Inclusive Communities and its "robust causality requirement," the causal connection Plaintiffs allege is stronger than that in Folger, as explained more fully below.

them as <u>individuals</u>," the court explained, consideration of prospective applicants was irrelevant. <u>Id.</u> (emphasis in original).

Next, Defendants argue that Plaintiffs' allegations fail the "robust causality requirement" announced in <u>Inclusive Communities</u>. They claim that the only causal relationship asserted in the Complaint "is that between the increased rent and the inability of nearly all of the individually named plaintiffs to continue living at Concierge." Defs.' Mem. Supp. Mot. Dismiss at 21. However, the rent increase is one of the actions being challenged, and the widespread effect of the rent increase relates more to whether there is a disparate impact than to what caused the disparate impact. Plaintiffs' causation argument is straightforward: Defendants' policies are the reason they are unable to remain at the complex. This alleged causal relationship is stronger and more direct than what was deemed sufficient in <u>Gallagher</u>, 619 F.3d at 835, and <u>Folger</u>, 43 F. Supp. 3d at 939 40, where plaintiffs alleged that enforcing housing codes against landlords reduced the supply of affordable housing and, in turn, caused a disparate impact on minority renters.

Finally, Defendants contend that, even if Plaintiffs have pleaded a prima facie case of disparate impact, Defendants' actions are necessary to achieve their interests and Plaintiffs have not pleaded any viable alternatives. To the extent that these second and third stages of the burden-shifting framework are proper topics when considering a motion to dismiss, a plaintiff need only identify a viable alternative to the challenged practice. <u>Folger</u>, 43 F. Supp. 3d at 941. Requiring more would be inappropriate because before the burden shifts back to the plaintiff to prove the viability of alternative practices, the defendant must prove that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests. <u>See</u> 24

17

C.F.R. § 100.500(c).  Here, Plaintiffs have alleged that Defendants could serve their business interests by either undertaking more modest renovations and rent increases, or negotiating a public subsidy in exchange for retaining affordable rents in some portion of units in the complex. Both of these alternatives are common-sense strategies for rental property and appear to have the potential to serve Defendants' business interests.  Accordingly, Plaintiffs have alleged a viable alternative to the challenged practices and may proceed with their disparate impact claim.

### 3.  Occupancy Standard

Plaintiffs also allege an additional, narrower disparate impact claim.  They assert that Defendants' two-persons-per-bedroom occupancy standard causes a disparate impact based on familial status.  Because almost all units at the complex have only one bedroom, Plaintiffs argue that the new limit effectively restricts each unit to two occupants and therefore precludes many families with children from living at the complex.

The FHA states that nothing contained therein "limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling."  42 U.S.C. § 3607(b)(1).  As to occupancy standards imposed by private landlords, however, the FHA is silent.  Badgett, 976 F.2d at 1179.  When faced with a challenge to a landlord's occupancy standard, a court must "examine the totality of the circumstances to determine whether the facially neutral standard results in discrimination against a protected class."  Id.

HUD has issued a Statement of Policy, referred to as the Keating Memo, to provide guidance in this area.  63 Fed. Reg. 70256 (Dec. 18, 1998).  The HUD policy is that an occupancy standard of two persons per bedroom is presumptively reasonable.  Id. at 70256.

However, the reasonableness of any occupancy standard is rebuttable.  Id. at 70257.  The factors HUD considers when reviewing occupancy standards are the size of the bedroom and unit; the age of the children involved; the configuration of the unit; other physical limitations of the housing; state and local law; and other evidence, such as discriminatory statements, suggesting that the occupancy standard is pretextual.  Id.

The Complaint lacks information on several of these factors.  Plaintiffs have not alleged the size of any bedroom or unit at the complex, even though many of the individual plaintiffs resided at the complex and had access to take measurements at the time the Complaint was filed.  Consequently, Plaintiffs also have failed to adequately allege the occupancy standard imposed by local law, which is a function of square footage.  See Richfield Code of Ordinances § 405.15.  Plaintiffs' allegation that local law would permit as many as four persons to occupy a unit at the complex is an unsupported legal conclusion that does not need to be accepted as true.  Iqbal, 556 U.S. at 678.

Nonetheless, Plaintiffs have alleged several facts that together may rebut the presumption in favor of Defendants' two-person occupancy standard.  The Concierge rental application indicates that Defendants will not make any exceptions to the occupancy standard, and two of the individual plaintiffs allege that their applications were rejected because Defendants counted their newborn infants.  Compl. ¶¶ 6(f), 6(u), 33; Ex. A at 3.  Under the age-of-children factor, HUD has indicated that it might not be reasonable to include infant children in the calculation of the occupancy standard.  63 Fed. Reg. at 70257.  Additionally, Plaintiffs' allegations that Defendants are trying to reposition the complex in the market and attract young professionals support an inference that the occupancy standard may be a pretext for replacing the existing tenant

population.  Compl. ¶¶ 2, 30  32.  Perhaps the biggest red flag is the sheer size of the occupancy

standard's impact:  834 people will be forced to move out of the complex.  Id. ¶ 32.

Plaintiffs have also alleged sufficient facts to support their claim that the effect of the

occupancy standard will fall disproportionately on tenants with children.  Because nearly all units

at the complex have only one bedroom, Defendants' occupancy standard effectively prohibits

more than two persons from living together in one unit.  Id.  A significant proportion of families

with children, however, consist of three or more persons.  Unsurprisingly, many cases finding

that an occupancy standard had a disparate impact based on familial status involved a limit of 2

persons per unit.  See, e.g., R.I. Comm'n for Human Rights v. Graul, 120 F. Supp. 3d 110,

114  15 (D.R.I. 2015); Gashi v. Grubb & Ellis Prop. Mgmt. Servs. Inc., 801 F. Supp. 2d 12,

15  17 (D. Conn. 2011); Fair Hous. Council of Orange Cty., Inc. v. Ayres, 855 F. Supp. 315, 318

(C.D. Cal. 1994).  Plaintiffs' disparate impact claim focused on Defendants' occupancy standard

is plausible on its face and may proceed.

## C.  State Law Claim

Plaintiffs also bring a claim under Minnesota law based on Defendants' occupancy

standard.  They allege that Defendants violated the notice and timing requirements of Minn. Stat.

§ 504B.315 in denying continued occupancy to two named plaintiffs with newborn children.

Minn. Stat. § 504B.315(b) states:

> No residential tenant of residential premises may be evicted,
> denied a continuing tenancy, or denied a renewal of a lease on the
> basis of familial status commenced during the tenancy unless one
> year has elapsed from the commencement of the familial status and
> the landlord has given the tenant six months prior notice in writing
> . . . .

The statute defines familial status as the condition of one or more minors being domiciled with their parent(s) or legal guardian, or a designee of the same.  Minn. Stat. § 504B.315(a).

The facts alleged by the two plaintiffs underlying the asserted violations of the statute differ and therefore must be analyzed separately.  First, Plaintiff Julio Stalin de Tourniel alleges that he resides at the complex with his wife and young son, who was nine months old at the time the Complaint was filed in early February 2016.  Compl. ¶ 6(u).  He further alleges that he anticipates having to move out when his lease expires in September 2016 because Defendants have told him they consider his son to be an additional person for purposes of the occupancy standard.  Id.  Those allegations do not state a claim under § 504B.315 because by the time de Tourniel is forced to move in September 2016 at least one year will have elapsed from the commencement of the familial status    that is, the birth of his son    and he will have had more than six months notice of Defendants' occupancy standard.

Second, Plaintiff Viky Martinez-Melgar alleges that she resides at the complex with her young son, who was two months old at the time the Complaint was filed.  Compl. ¶ 6(f).  She alleges that when she applied to have her partner and the father of her child move in with them, Defendants denied the application because they counted the child against the two-person occupancy standard.  Id.  That denial was not on the basis of familial status as that term is defined under the statute.  Familial status exists where one or more children is domiciled with at least one parent, guardian, or other designated adult.  Minn. Stat. § 504B.315(a).  Martinez-Melgar had familial status as soon as her son began living in her apartment with her.  Having her partner move into the apartment would not change that.  Accordingly, Defendants' denial of her application to have her partner move in was not a denial based on familial status but rather a

21

denial based on Defendants' generally applicable occupancy standard.  She, too, has failed to state a claim under § 504B.315.

Because only de Tourniel and Martinez-Melgar assert factual allegations of a potential claim under § 504B.315, Defendants' motion to dismiss this claim is granted.

**D.  Sufficiency of Complaint as to Individual Plaintiffs**

Next, Defendants argue that many of the individual plaintiffs should be dismissed from the case.  According to Defendants, the only bases alleged for these plaintiffs' claims are either Defendants' decision not to accept Section 8 vouchers or Defendants' rent increases.  Defendants contend that neither of these actions can support a discrimination claim under the FHA.

Defendants read the Complaint too narrowly.  On a motion to dismiss, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009).  All Plaintiffs, including the individual plaintiffs targeted for dismissal, allege that Defendants have taken a series of actions at the complex that constitute disparate treatment and cause a disparate impact on protected classes.  Compl. ¶¶ 1 3.  The individual plaintiffs further allege the protected class to which they belong, the length of time they have resided at the complex, the number of people in their household, and when and why they anticipate they will have to move out.  Id. ¶ 6.  That some of them cited only the Section 8 policy or rent increases as the reason they will have to move does not remove them from the lawsuit.  Viewed in a light most favorable to Plaintiffs, these allegations can be read as identifying one   but not the only   reason these individual plaintiffs will have to move.

Even under Defendants' restrictive reading of the Complaint, the individual plaintiffs

22

have pleaded viable claims under the FHA.  Defendants assert that neither the decision not to

accept Section 8 vouchers nor the rent increases can, by itself, violate the FHA.  However, no

such blanket exemptions from FHA liability exist in the text of the statute or the case law of the

Supreme Court or Eighth Circuit.  See 42 U.S.C. § 3604; Graoch, 508 F.3d at 375 ("Nothing in

the text of the FHA instructs us to create practice-specific exceptions.").  If a plaintiff could

prove that a defendant took either action with intent to discriminate against a protected class, the

plaintiff presumably would have a disparate treatment claim under the FHA.  See Matarese v.

Archstone Pentagon City, 795 F. Supp. 2d 402, 439 40 (E.D. Va. 2011) (finding FHA violation

where plaintiffs showed that a 34 percent rent increase was intended to discriminate against

them).  And if a plaintiff proved that either practice caused a disparate impact, the burden would

be on the defendant to prove that the practice is necessary to achieve one or more substantial,

legitimate, nondiscriminatory interests.  See 24 C.F.R. § 100.500(c); Graoch, 508 F.3d at 369

(holding that "a plaintiff can, in principle, rely on evidence of some instances of disparate impact

to show that a landlord violated the Fair Housing Act by withdrawing from Section 8").[6]

---

[6] While the Second and Seventh Circuits appear to have adopted a per se rule that refusal to participate in Section 8 cannot form the basis of a disparate impact claim under the FHA, see Salute v. Stratford Greens Gardens Apartments, 136 F.3d 293, 302 (2d Cir. 1998); Knapp v. Eagle Property Management Corp., 54 F.3d 1272, 1280 (7th Cir. 1995), the Graoch court expressly rejected such a per se rule.  Additionally, HUD has indicated a preference for case-by-case review of practices alleged to cause a disparate impact.  See 78 Fed. Reg. at 11471 (the FHA "covers many different types of entities and practices, and a determination of what qualifies as a substantial, legitimate, nondiscriminatory interest for a given entity is fact-specific and must be determined on a case-by-case basis").

It also should be noted that Graoch distinguished between landlords who withdraw from Section 8 and those who refuse to participate in the first place, saying that the latter group "should never face disparate-impact liability for non-participation in Section 8."  508 F.3d at 377. It is not clear how that distinction would apply to this case, where Section 8 vouchers were accepted at the complex until Defendants acquired it and announced that they would not accept Section 8 vouchers.  But that is a question for another day.

**E.  HOME Line's Standing**

Finally, Defendants argue that HOME Line should be dismissed from the case because it lacks standing.  The Supreme Court has held that "Congress intended standing under [the FHA] to extend to the full limits of Art. III."  Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982) (quoting Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 103 n.9 (1979)).  To establish Article III standing, a plaintiff must satisfy three elements:  injury in fact, causation, and redressability.  E.g., Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 61 (1992).  The party invoking federal jurisdiction bears the burden of establishing these elements.  Id. at 561.  At the pleading stage, "general factual allegations of injury resulting from defendant's conduct may suffice" to establish standing.  Id.

Courts have found that fair housing organizations have standing to sue under the FHA where they "'devote significant resources to identify and counteract' a defendant's unlawful practices."  Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Ltd., 160 F.3d 433, 434 (8th Cir. 1998) (quoting Havens, 455 U.S. at 379).  In Havens, the Supreme Court held that a fair housing organization had standing because the resources it spent addressing defendants' unlawful racial steering "perceptibly impaired" its ability to provide its regular counseling and referral services.  455 U.S. at 379.  Similarly, in 215 Alliance v. Cuomo, 61 F. Supp. 2d 879, 884 (D. Minn. 1999), the court held that a fair housing organization had standing because it faced "the mad scramble to protect the interests of low-income tenants" after they received inadequate notice that their landlord was terminating its project-based Section 8 contracts and raising rents.

Here, HOME Line has pleaded facts sufficient to establish standing at this stage of the proceedings.  HOME Line alleges that Defendants' allegedly unlawful actions have interfered

24

with its mission by causing it to divert significant organizational resources, including staff time and materials, from other planned activities to contact affected tenants, meet with other organizations about this issue, and investigate potential legal claims.  Compl. ¶¶ 65  66.  This diversion of resources is an injury similar to those deemed sufficient in Havens and 215 Alliance that was caused by the displacement of Concierge tenants and would be redressed by a favorable decision in this action.  See Lujan, 504 U.S. at 560  61; Havens, 455 U.S. at 379; 215 Alliance, 61 F. Supp. 2d at 884.

Contrary to Defendants' argument, the decision in Community Stabilization Project v. Cuomo, 199 F.R.D. 327 (D. Minn. 2001), is distinguishable.  In Community Stabilization, the fair housing organization sought to enjoin the planned sale and demolition of a low-income apartment building.  199 F.R.D. at 329.  All but one of the building's former tenants, however, had already relocated with assistance from the defendant.  Id. at 330.  The fair housing organization therefore did not need to identify and counteract ongoing unlawful practices, as in Havens, or make a "mad scramble" to assist tenants being displaced from their homes, as in 215 Alliance.  Id. at 332.  Here, in contrast, hundreds of tenants at the complex who cannot meet Defendants' rental criteria and increased rents are being forced to move as their leases expire.  HOME Line's efforts to assist these tenants give rise to an injury sufficient to confer standing.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [Docket No. 10] is **GRANTED IN PART and DENIED IN PART**, as follows:

1.      The Motion seeking to dismiss Plaintiffs' claims under the Fair Housing Act is **DENIED**.

2.      The Motion seeking to dismiss Plaintiffs' claim under  Minn. Stat. § 504B.315 is **GRANTED**.

3.      The Motion seeking to dismiss individual plaintiffs as parties is **DENIED**.

4.      The Motion seeking to dismiss HOME Line as a party is **DENIED**.


                        BY THE COURT:



                        s/Ann D. Montgomery
                        ANN D. MONTGOMERY
                        U.S. DISTRICT JUDGE

Dated: July 5, 2016

26